UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

FRANK MADDEN,

     Plaintiff,

v.

UNITED STATES CENTER FOR
SAFESPORT, INC.,

     Defendant.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Frank Madden sues Defendant United States Center for SafeSport, Inc.

("SafeSport" or the "Center") and states:

**INTRODUCTION**

1.     This case is about whether the federal government may transfer its formidable power to a private corporation and stand aside while that corporation does what the government could never constitutionally do: punish a blameless citizen, under rules that it drafted for itself and that defy due process, based on forty-year-old allegations of abuse; publicize its baseless suspicion in an online database for the world to see and sneer; and deprive that citizen of his right to earn a living through the only trade he has ever known. That is forbidden. "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution simply by resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). "The Constitution," after all, "deals with substance, not shadows." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866).

2.     Madden challenges provisions of the Ted Stevens Olympic and Amateur Sports Act (the "Amateur Sports Act" or the "Act"), 36 U.S.C. § 220501 *et seq.*—in particular, the

provisions that delegate federal governmental power to a private corporation, SafeSport, without subjecting SafeSport to the federal government's control, *see* 36 U.S.C. §§ 220541–43.

3.  Congress empowered SafeSport to promulgate binding rules for addressing abuse claims against anyone affiliated with Olympic and amateur sports across the United States. But Congress did not stop there. It also empowered SafeSport itself to enforce those rules against accused abusers, adjudicate their liability, and punish them. Under one roof, SafeSport exercises legislative, executive, and judicial functions.

4.  A small paper tiger of commingled power would be one thing. But SafeSport is anything but. Over eleven million Americans—from athletes to coaches, from medical professionals to administrators—fall within SafeSport's governing jurisdiction.

5.  SafeSport's authority is as penetrating as it is broad. In each case, SafeSport may wield its power to ruinous effect. Here, SafeSport received reports that Madden—a world-renowned trainer in the United States Equestrian Federation ("USEF") with a spotless reputation—committed abusive acts forty years ago. Before granting him an opportunity to be heard, SafeSport barred Madden from training his own USEF-participant students and operating his own USEF-level training business, thereby destroying his career and livelihood.

6.  Equally devastating was SafeSport's decision to list Madden in its Centralized Disciplinary Database—again, even before affording him a hearing. That database is available for anyone to access: https://cdd.uscenterforsafesport.org/. Inclusion there is irreparably stigmatizing. Figure skater John Coughlin, having been ensnared in SafeSport's pseudo-governmental net, killed himself. To the general public, the prototypical name on the list—the target who most readily comes to mind—is sexual predator Larry Nassar, a physician for USA

2

Gymnastics who abused hundreds of young female gymnasts. But Madden has committed no wrongdoing. He has no place on any list that includes the likes of Nassar.

7.      Had Congress authorized the federal government to control SafeSport's policies, procedures, and operations, the delegation might have passed constitutional muster. But Congress did not do so. Indeed, SafeSport is proudly independent. As SafeSport spokesperson Dan Hill put the point: "The Center has its own governance, oversight, and policies."

8.      SafeSport thus reflects "delegation in its most obnoxious form," as its sweeping jurisdiction and unchecked activities violate a bedrock premise of our constitutional order: only governmental and government-supervised actors may exercise governmental powers. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) ("Those who govern the People must be accountable to the People. Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn.").

9.      SafeSport's operations here are unconstitutional—facially and as applied to Madden—in three respects. First, because SafeSport does not "function[] subordinately to" any federal governmental entity, the Amateur Sports Act and SafeSport's activities under the Act are unconstitutional under the private non-delegation doctrine. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 659 (2025) (citation modified). Second, because SafeSport exercises powers that are "traditionally exclusively" governmental, its failure to afford Madden due process while depriving him of protected property and liberty interests—including his liberty interests in avoiding stigma and pursuing his chosen occupation—violates the Fifth Amendment's Due Process Clause. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974). Third, because

3

SafeSport adjudicates private rights while denying respondents a judicial forum, it violates Article III. *See SEC v. Jarkesy*, 603 U.S. 109, 111–12 (2024).

10.     SafeSport, for its part, routinely asserts that it does not exercise governmental powers, pointing to the Amateur Sports Act's disclaimer that SafeSport is not a "state actor." 36 U.S.C. § 220541(a)(2)(d). But as Justice Alito warned: "One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern. Given this incentive to regulate without saying so, everyone should pay close attention when Congress sponsors corporations that it specifically designates not to be agencies or establishments of the United States Government." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 57 (2015) (Alito, concurring) (citation modified).

11.     Put differently, SafeSport cannot have it both ways: power without accountability. Either it must answer to a supervisory governmental authority; or it must stop exercising governmental power and suffer the indignities of private life—including vulnerability to defamation suits, *see* 36 U.S.C. § 220541(d)(1) (immunizing SafeSport from such claims).

12.     SafeSport's unconstitutional conduct has caused and is causing Madden substantial harm, and unless this Court intervenes, his injuries will be irreparable. High-level equestrian training is the "common occupation[] of life" to which Madden has dedicated himself, as is his right. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). SafeSport's ban on Madden's USEF activity, however, has precluded him from pursuing his vocation and is severely impairing his USEF business, Frank Madden Show Stable LLC d/b/a Capital Hill Show Stables. Madden has thereby suffered direct and concrete injuries and, absent injunctive relief, is at risk of suffering not only irremediable losses to hard-earned goodwill and customer relationships, but also the destruction of his business. Still more, Madden's inclusion in SafeSport's Centralized

4

Disciplinary Database has eviscerated his reputation in the equestrian community and thereby exacerbated his injuries, which will continue and worsen without injunctive relief.

13.     Madden's predicament is Kafkaesque—with the added wrinkle that the baffling, life-altering process in which he is trapped is one of hybrid private-public machinery. Madden started high-level equestrian training in 1970, and for over 55 years, Madden received no complaints that he had engaged in any such inappropriate conduct with respect to any of his students—including the complainants in SafeSport's proceedings against him. Quite the contrary, multiple generations of students celebrated Madden—both for his acumen as a teacher and, more importantly, for his guidance as a mentor. Then out of nowhere in late 2025 came SafeSport's claims about alleged acts in the mid-1980s. Punishment promptly followed before Madden could get in a word. He has done no wrongdoing whatsoever; he presents no risk to anyone in the equestrian community, especially not to his students; and yet his indisputable evidence on these matters, including his nearly six-decade record of unassailable professionalism, is disregarded through a process that bars and brands him without ascertaining the truth. He and his family are in shock.

14.     SafeSport's illicit exercise of governmental power to stigmatize Madden and bar him from pursuing his life's calling—all without affording him due process or a judicial forum— is a manifest injustice that this Court should swiftly correct.

## THE PARTIES

15.     Madden is a U.S. citizen and resident of Palm Beach County, Florida.

16.     SafeSport is a not-for-profit corporation established in 2017 and incorporated in Colorado. Its principal place of business is 385 S. Colorado Blvd., Building A, Suite 706, Denver, Colorado 80222. It maintains a registered agent in Florida, is authorized to transact

business in Florida, and may be served with process at Corporate Creations Network Inc., 801 U.S. Highway 1, North Palm Beach, Florida 33408.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the case presents claims arising under the Constitution and federal statutes.

18.     This Court may grant the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57, and the requested injunctive relief under Fed. R. Civ. P. 65.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2), as this judicial district is where a substantial part of the events or omissions giving rise to this case's claims occurred. Further, Madden resides and is suffering harm in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(3) because SafeSport is subject to this Court's personal jurisdiction.

## FACTS

**A.     SafeSport's Statutory Origins**

20.     In 1978, Congress enacted the Amateur Sports Act, which entrusted the United States Olympic & Paralympic Committee ("USOPC"), a federally chartered corporation, with overseeing the nation's representation in the Olympic and Paralympic Games. 36 U.S.C. §§ 220502(a), 220503. The USOPC recognized a National Governing Body ("NGB") for each Olympic sport, and each NGB became a member of the USOPC. 36 U.S.C. § 220521(a).

21.     In 2018, Congress enacted the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act, which amended the Amateur Sports Act. Pub. L. No. 115-126, 132 Stat. 318, 320–24 (2018) ("2018 Amendment"). The 2018 Amendment designated SafeSport as "the independent national safe sport organization for the United States" and provided that SafeSport would "exercise jurisdiction over the [USOPC], each [NGB], and each paralympic sports organization with regard to safeguarding amateur athletes against abuse, including

emotional, physical, and sexual abuse, in sports." 132 Stat. at 320 (codified at 36 U.S.C. § 220541(a)(1)(A), (B)).

22.     The 2018 Amendment also required SafeSport to "develop training, oversight practices, policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through [NGBs] and paralympic sports organizations," and to "establish mechanisms that allow for the reporting, investigation, and resolution … of alleged sexual abuse in violation of the Center's policies and procedures." *Id.* at 321 (codified at 36 U.S.C. § 220541(a)(1)(C), (D)).

23.     Importantly, the 2018 Amendment provided that SafeSport's "policies and procedures … shall apply as though they were incorporated in and made a part of section 220524," which sets forth NGBs' obligations. *Id.* (codified at 36 U.S.C. § 220541(b)). The amendment further provided that "[t]he Center may, in its discretion, utilize a neutral arbitration body and develop policies and procedures to resolve allegations of sexual abuse within its jurisdiction to determine the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official, who is the subject of such an allegation, to participate in amateur athletic competition." *Id.* (codified at 36 U.S.C. § 220541(c)(1)). And the amendment provided that SafeSport shall "submit an annual report to Congress," including "an audit" and "a description of the activities of the Center." *Id.* at 323 (codified at 36 U.S.C. § 220543).

24.     In 2020, Congress enacted the Empowering Olympic, Paralympic, and Amateur Athletes Act, which further amended the Amateur Sports Act. Pub. L. 116-189, 134 Stat. 943 (2020) ("2020 Amendment"), including by requiring SafeSport to "publish and maintain a publicly accessible internet website that contains a comprehensive list of adults who are barred by the Center." 134 Stat. at 961 (codified at 36 U.S.C. § 220541(a)(1)(G)).

25.     The 2020 Amendment also required SafeSport to "ensure that any action taken by the Center against an individual under the jurisdiction of the Center, including an investigation, the imposition of sanctions, and any other disciplinary action, is carried out in a manner that provides procedural due process to the individual." *Id.* (codified at 36 U.S.C. § 220541(a)(1)(H)).

26.     The 2020 Amendment further provided that the Comptroller General may take "reasonable steps" to be "fully informed" about SafeSport's operations, *id.* at 966 (codified at 36 U.S.C. § 220541(j)(3)(A)), while requiring the USOPC to fund SafeSport through annual $20 million payments, *id.* at 963 (codified at 36 U.S.C. § 220541(g)).

**B.      SafeSport's Unaccountable Exercise of Governmental Power**

27.     The Amateur Sports Act imbues SafeSport with legislative power, including by authorizing it to promulgate binding rules of private conduct associated with abuse allegations. 36 U.S.C. § 220541(a)(1)(C), (D).

28.     The Amateur Sports Act imbues SafeSport with executive power, including by authorizing it to launch investigations, search for evidence, and enforce, or decide not to enforce, its rules against accused abusers. *Id.* § 220541(a)(1)(G), (H).

29.     The Amateur Sports Act imbues SafeSport with judicial power, including by authorizing it to adjudicate abuse claims and thus private rights. *Id.* § 220541(a)(1)(C), (D), (H).

30.     Yet the Amateur Sports Act does not authorize the federal government to approve, disapprove, modify, or otherwise control SafeSport's exercise of delegated legislative, executive, and judicial power.

31.     As SafeSport spokesperson Dan Hill explained: "The Center has its own governance, oversight, and policies." Pete Madden & Dan Murphy, *SafeSport CEO testifies*

8

*before oversight panel as lawmakers weigh increasing its public funding*, ABC News (Feb. 5, 2020), https://abcnews.com/US/safesport-ceo-testify-oversight-panel-lawmakers-weigh-increasing/story?id=68767292.

32.     Under SafeSport's bylaws, a volunteer board of directors controls SafeSport's governance and affairs: "All corporate powers of the Corporation shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors." *See* Sixth Amended and Restated Bylaws of U.S. Center for SafeSport (Jan. 1, 2024), art. 2.1. ("2024 Bylaws").

33.     The 2024 Bylaws also state in pertinent part that: (a) "[d]irectors shall be elected by the Board of Directors at the annual meeting of the Board of Directors," *id.*, art. 2.2(c); (b) "[t]he officers of the Corporation shall consist of a chair of the Board, vice chair of the Board, secretary, treasurer, chief executive officer and such other officers, assistant officers and agents as may be deemed necessary or desirable by the Board of Directors," *id.*, art. 3.1; and (c) officers and directors must discharge their duties "in a manner the director or officer reasonably believes to be in the best interests of the corporation," *id.*, art. 4.1.

34.     No federal statute, regulation or SafeSport bylaw authorizes the federal government to approve, disapprove, modify, or otherwise control SafeSport's operations.

35.     SafeSport's directors, officers, and employees are not government officials.

36.     The policies and procedures that SafeSport has developed under the Amateur Sports Act are known as the "SafeSport Code." U.S. Gov't Accountability Off., GAO-21-128R, *Amateur Athletes: The U.S. Center for SafeSport's Response and Resolution Process for Reporting Abuse* (2020), at 3.

37.     As of this action's filing, the 2026 version of the SafeSport Code is the most recent. *See* SafeSport Code for the U.S. Olympic & Paralympic Movement (Jan. 1, 2026) ("2026 Code"), https://uscenterforsafesport.org/response-and-resolution/safesport-code/. Because SafeSport initiated proceedings against Madden on December 23, 2025, the 2024 version of the Code is also relevant here. *See* SafeSport Code for the U.S. Olympic & Paralympic Movement (July 1, 2024) ("2024 Code"), https://uscenterforsafesport.org/wp-content/uploads/2023/03/2024_SafeSportCode-_073124_v3-A-.pdf. For purposes of this action, the Codes are identical in all material respects (together, "2024–26 Code").

38.     Under 36 U.S.C. § 220541(b), which provides that SafeSport's "policies and procedures … shall apply as though they were incorporated in and made a part of" the Amateur Sports Act, the SafeSport Code carries the force of federal law.

39.     Yet SafeSport promulgated the SafeSport Code without following any legislative or agency rulemaking process. Neither Congress nor any agency participated in its drafting.

40.     SafeSport does not provide the public with notice or opportunity for comment before it amends the SafeSport Code.

41.     SafeSport has plenary power to draft, amend, enforce, interpret, and adjudicate violations of the SafeSport Code. No federal governmental entity controls those functions.

42.     "Procedural due process" is a term of art, deeply rooted in American history and tradition, that refers to the federal and state government's guarantee that no person shall be "deprived of life, liberty, or property" without adequate process. *See* U.S. Const. amends. V, XIV. The Amateur Sports Act's and the SafeSport Code's express references to "procedural due process," which applies to American governmental entities, reinforce that Congress delegated governmental power to SafeSport. Otherwise, the references to "procedural due process" would

10

be superfluous. *See* 36 U.S.C. § 220541(a)(1)(H) (requiring that "any action taken by the Center against an individual under the jurisdiction of the Center, including an investigation, the imposition of sanctions, and any other disciplinary action, is carried out in a manner that provides procedural due process to the individual"); 2024–26 Code § XI.J (noting that "[f]ederal law provides Respondents with certain procedural rights," and that SafeSport "must provide procedural due process to the Respondent"); *see also* 36 U.S.C. § 220541(a)(1)(E) (requiring SafeSport to provide "fair notice and an opportunity to be heard"); *id.* § 220522(8) (requiring NGBs to provide "fair notice and opportunity for a hearing to any amateur athlete, coach, trainer, manager, administrator, or official before declaring the individual ineligible to participate").

43.     A 2022 report by SafeSport touts its "independent mandate, authorized at America's highest levels and enshrined in federal law … [t]o protect athletes at all levels from abuse and misconduct … [a]nd ensure accountability of individuals and institutions to appropriate safety standards …. [e]ffectively, with sufficient personnel and resources to execute best practices without undue obstacles." This report also characterizes "statutes of limitations" as "[s]ystems-level impediments … in criminal or civil justice systems." Ju'Riese Colón, *Our Journey Toward Safer Sport*, U.S. Center for SafeSport (2022), at 2, https://uscenterforsafesport.org/wp-content/uploads/2022/03/2022-SafeSport-Impact-Report.pdf.

44.     As a 2023 report by SafeSport sums: "Whether we banned an abusive coach when criminal prosecutors declined the case, assisted law enforcement in bringing an abuser to justice, acted on allegations of abuse disclosed decades later, or sanctioned those in positions of power who failed to report abuse, the Center is bringing accountability to every level of sport." Ju'Riese Colón & April Holmes, *Grassroots to Gold: Athlete Safety at Every Level—2023 Annual Report*,

U.S. Center for SafeSport (2023), at 5, https://uscenterforsafesport.org/wp-content/uploads/2024/06/2023-AnnualReport_071124_v3.5.pdf.

47. 45.   A 2024 SafeSport report details that SafeSport's "authority encompasses 11+ million individuals" and that its "charge" from Congress is to, among other tasks, "investigate allegations of misconduct and sanction wrongdoers in sport." April Holmes & Julie Fabsik-Swarts, *United and Evolve: Reaching Higher for Athlete Safety*, U.S. Center for SafeSport (2024), at 7, https://uscenterforsafesport.org/wp-content/uploads/2025/06/2024-Annual-Report_063025_v4.1.pdf.

46.   The federal government itself recognizes that the Amateur Sports Act is one of a kind. At oral argument in the Fourth Circuit, counsel for the U.S. Department of Justice, upon being asked whether "any other statute" similarly empowers a private organization to set forth binding rules of conduct, answered: "I'm not sure if there are others like that. … There are other statutes that recognize not conduct standards, but other kinds of standards … ." Hr'g, *Navarro v. U.S. Ctr. for SafeSport*, No. 25-1150 (4th Cir. Dec. 10, 2025), at 27:15.

**C.      The SafeSport Code's Due-Process Defects**

47.   The SafeSport Code states that "USOPC, NGBs, and Local Affiliated Organizations (LAOs) must comply, in all respects, with these policies and procedures and shall be deemed to have incorporated the provisions into their relevant policies as if they had set them out in full therein." 2024–26 Code § II.

48.   The SafeSport Code asserts that its provisions govern "Participants," who—"by virtue of being a Participant"—"have expressly agreed to the jurisdiction of the Center and this Code's policies and procedures." *Id.* §§ II, III.

49.     The SafeSport Code defines "Participant" to include, among others, "[a]ny individual" who "at the time of any alleged Code violation" is a "member," "license holder," or "employee" of an NGB, LAO, or the USOPC, or who is "[w]ithin the governance or disciplinary jurisdiction of an NGB, LAO, or the USOPC." 2024 Code § VIII.L; *accord* 2026 Code § VIII.M. That is, "Participants may include coaches, athletes, volunteers, trainers, and medical personnel." GAO-21-128R, *supra*, at 3.

50.     Under the SafeSport Code, SafeSport claims the jurisdiction to "investigate and resolve allegations" that a Participant engaged in various forms of "[i]nappropriate conduct." 2024–26 Code §§ IV, IX.

51.     Under the SafeSport Code, "no criminal, civil, or rules-based statutes of limitations or time bars of any kind prevent the Center from investigating, assessing, considering, and adjudicating any relevant conduct regardless of when it occurred." *Id.* § XI.G.

52.     Under the SafeSport Code, SafeSport imposes on Participants, who have merely been accused of misconduct, so-called "Temporary Measures." It may impose these measures "at any time," before providing Participants notice or an opportunity to be heard, and before SafeSport has taken any steps to investigate the allegations. *Id.* § XII.A.1–2.

53.     The Temporary Measures may include "suspensions from participation in some or all aspects of sport activity," *id.* § XII.A.3, and naming the Participant in a "publicly available and searchable database," *id.* § XIII.C.

54.     SafeSport's Centralized Disciplinary Database is located here: https://cdd.uscenterforsafesport.org/. The website's homepage states: "The U.S. Center for SafeSport's Centralized Disciplinary Database is a resource designed to keep the public informed when individuals connected with the U.S. Olympic & Paralympic Movements are either subject

to certain temporary restrictions pending investigation by the Center or are subject to certain sanctions after an investigation found them in violation of the SafeSport Code. … Users can search the database by Name, City, State, and/or Sport Affiliation(s). Enter as much (or as little) information as you know. Search results will include the Participant's Name, City, State, Sport Affiliation(s), Decision Date, Misconduct, and Action Taken."

55.     Inclusion in the Centralized Disciplinary Database is profoundly stigmatizing.

56.     According to the SafeSport Code: "The Center is required under 36 USC § 220541(a)(1)(G) to maintain a publicly available and searchable database of Adult Participants whose eligibility has in some way been restricted by the Center, the USOPC, an NGB, or an LAO." 2024–26 Code § XIII.C.

57.     Under the SafeSport Code, after SafeSport imposes a Temporary Measure, the Participant may request that SafeSport review the Temporary Measure's "appropriateness" at a hearing before an arbitrator. *Id.* § XII.B.6.a.

58.     The parties at the Temporary-Measures Hearing are SafeSport and the accused Participant, i.e., the Respondent. *Id.* § XII.B.6.c.

59.     At the Temporary-Measures Hearing, the arbitrator does not "resolve whether the Respondent has committed a violation"; rather, the arbitrator may only "approve, reject, or modify the Temporary Measures," a determination that turns on "whether sufficient information exists to satisfy the Arbitrator that the Temporary Measures as imposed are reasonably appropriate to mitigate risk based on the known circumstances of the case at the time of the hearing." *Id.* § XII.B.6.a, f.

60.     At the Temporary-Measures Hearing, instead of considering whether the allegations against the Respondent are substantiated, the arbitrator considers: "the seriousness of

the allegations and the circumstances of the case"; whether "the Respondent's continued participation in sport poses an ongoing or potential risk to the physical, emotional, or psychological well-being or safety of others, including … the Claimant, other Athletes, or the sport community"; and whether "the allegations against the Respondent are sufficiently serious that the Respondent's continued participation in the sport could be detrimental to the best interest of sport and those who participate in it." *Id.*

61.     Respondents' rights at the Temporary-Measures Hearing are severely restricted. "[T]here shall be a rebuttable presumption that the allegations, as presented, are true"; the Participant may not review SafeSport's investigative file or present live witness testimony; and "[w]hen the allegations involve child sexual abuse, the age of those allegations shall not be considered and are not relevant to the assessment of Temporary Measures"—even if the allegations are several decades old. *Id.* § XII.B.6.e, f.

62.     The Respondent must pay a $600 fee for the Temporary-Measures Hearing and has no say in the arbitrator's selection. *Id.* § XII.B.3, Ex. 1.

63.     The arbitrator's decision is based on written submissions and oral argument. 2024–26 Code § XII.B.6.g. The decision is not appealable; a party may request reconsideration "no sooner than 120 calendar days" after the hearing. *Id.* § XII.B.6.h, i.

64.     The Temporary-Measures Hearing does not assess the evidentiary basis of SafeSport's allegations and fails to afford Participants a meaningful opportunity to challenge the allegations against them or clear their names.

65.     Under the SafeSport Code, in parallel with temporary-measures proceedings, SafeSport investigates the allegations. *Id.* § XI.A.

15

66. After its investigation, SafeSport decides whether to informally resolve the case, administratively close the case, or formally determine that the accused Participant violated the SafeSport Code. *Id.* § XI.

67. If SafeSport determines, based on a preponderance of the evidence, that an accused Participant violated the SafeSport Code, it will impose "appropriate" sanctions, which may include permanent ineligibility from participating in any program under the auspices of the USOPC, any NGB, or any LAO—as well as continued inclusion in the Centralized Disciplinary Database. *Id.* § XIII.A.

68. After SafeSport imposes sanctions, the accused Participant may challenge the determination through a Merits Arbitration. *Id.* § XIV.2.

69. The parties at the Merits Arbitration are SafeSport and the accused Participant, i.e., the Respondent. *Id.* § XIV.4.

70. Respondents' rights at the Merits Arbitration are severely restricted. The Respondent receives SafeSport's notice of decision, investigative report, and exhibits, but "[t]here shall be no additional discovery"; "[s]trict conformity to legal rules of evidence shall not be necessary, and hearsay evidence may be considered"; and the Respondent has no right to examine the complainant. *Id.* § XIV.17, 26, 28.d.

71. For the Merits Arbitration, the Respondent must pay a $5,500 fee and an additional $325 for each hour over eight hours. 2026 Code, Ex. 1.

72. According to the SafeSport Code: "The Arbitration Decision shall be considered final and binding. The parties waive, to the fullest extent permissible by law, any right to challenge in court the Arbitrator Decision." 2024–26 Code § XIV.34.

73.     The Merits Arbitration fails to afford Participants a meaningful opportunity to challenge the allegations against them or to clear their names.

**D.      SafeSport's Record of Malfeasance and Misconduct**

74.     In December 2018, SafeSport added John Coughlin, a figure skater, to its Centralized Disciplinary Database, noting that it had imposed an "interim measure" of a "restriction" on him—before completing an investigation, and before affording Coughlin a hearing. Two weeks later, SafeSport updated Coughlin's status to "interim suspension." The next day, he committed suicide. *See* Dan Murphy, *"Nothing about it is easy": Skater's suicide leaves more questions than answers*, ESPN (Jan. 28, 2019), https://www.espn.com/olympics/story/_/id/25870759/john-coughlin-suicide-leaves-more-questions-answers-figure-skating-community.

75.     In January 2025, Pennsylvania authorities charged a SafeSport investigator with a series of crimes, including rape, sexual servitude, and prostitution.

76.     In February 2025, Senator Charles Grassley, Chairman of the Senate Judiciary Committee, wrote to SafeSport CEO Ju'Riese Colón concerning the troubling allegations. Letter from Sen. Charles Grassley to Ju'Riese Colón, SafeSport CEO (Feb. 10, 2025), at 1, https://www.grassley.senate.gov/imo/media/doc/grassley_to_safesport_-_hiring_practices.pdf.

77.     The charges led Senator Grassley to "call into question the quality of SafeSport's vetting processes of its own officials." *Id.*

78.     In February 2025, a Florida state court held, in a proceeding to expunge an athlete's criminal record, that SafeSport had "perpetrated a fraud on the court"; had "acted in bad faith, intentionally, and with malice"; had provided an "incomplete file, withholding exculpatory information and withholding witness statements potentially favorable to the defendant"; had failed to cooperate with subpoenas and had improperly refused to produce documents; and had

"attempt[ed] to influence the Sheriff's investigation." Order, *In re U.S. Ctr. for SafeSport, Inc.*, Nos. 2022-MM-002950-A & 2022-MM-001423-A (Fla. Seminole Cnty. Ct. Feb. 25, 2025), Doc. 217527824. The court also held that SafeSport knew that complaining witnesses had given false testimony yet withheld this fact from the criminal defendant and the court. *Id.* A copy of the order is available here: Pl.'s Notice, *Strine v. U.S. Ctr. for Safe Sport*, No. 1:24-cv-02329 (D. Colo. Mar. 19, 2025), ECF No. 47-1, at Ex. 1.

79.     That order prompted Senator Grassley to again contact SafeSport's leadership. In March 2025, he wrote to them to "inquire about the Board of Directors' oversight and management of SafeSport's officers and directors." Letter from Sen. Charles Grassley to April Holmes, SafeSport Exec. Comm. Chair (Mar. 31, 2025), at 1, https://www.grassley.senate.gov/imo/media/doc/grassley_to_safesport_board_of_directors_-_vetting_and_hiring_practices.pdf.

80.     Senator Grassley noted that it was "troubling to read that SafeSport 'perpetrated a fraud' against a Florida State Court." *Id.* He also observed that "[t]here appears to be a lack of oversight by the Board to adequately supervise the CEO … and other officers and directors in their duties to the organization." *Id.*

81.     Senator Grassley's letters underscore SafeSport's lack of accountability. Its operatives conduct their day-to-day business, and make decisions in individual cases, without accountability to a senior or supervisory authority.

82.     SafeSport's responses to Senator Grassley's letters underscore the lack of federal governmental authority over SafeSport's operations. Indeed, while SafeSport offered to respond to the senator's questions and "brief" the senator and his team, nowhere did SafeSport consider itself legally obligated to do so: "The Center continues to be willing to respond to your questions

18

and offered, and requested via email, the opportunity to brief you and your team … .” *See* Letter from Jessica Perrill, SafeSport General Counsel, to Sen. Charles Grassley (May 1, 2025), at 1, https://www.grassley.senate.gov/imo/media/doc/safesport_to_grassley_-_vetting_and_hiring_practices.pdf.

**E.     SafeSport's Egregious and Unconstitutional Treatment of Madden**

83.     USEF is the NGB for equestrian sport. It is analogous to the NFL for football, the NBA for basketball, and the MLB for baseball.

84.     Under the Amateur Sports Act, USEF members are subject to SafeSport's jurisdiction, and USEF must follow SafeSport's disciplinary decisions, including Temporary Measures and Sanctions. *See* 36 U.S.C. § 220541(a)(1)(B).

85.     Equestrian athletes and trainers may participate in horse shows at the top tiers of equestrian sport, including at the Olympic level, only if they are USEF members.

86.     At all times relevant here, Madden has been a member of USEF and subject to SafeSport's jurisdiction.

87.     Madden has devoted his life to high-level equestrian sport. He is a world-renowned equestrian trainer. He began high-level equestrian training in 1970. He has over 55 years of experience and numerous accolades for developing equestrian talent across the highest levels of national and international competition.

88.     Madden is the head trainer and owner of Frank Madden Show Stable LLC d/b/a Capital Hill Show Stables, a training program for serious riders on the path to national and international goals.

89.     Throughout his career, Madden has traveled to horse shows around the country with his wife, a well-known equestrian trainer, and his daughter, a distinguished equestrian.

90.     During his career, Madden has trained over 300 students in elite equestrian sport.

19

91.     In the 1980s, Madden trained scores of students in elite equestrian sport. Numerous students have commended Madden for his teaching and mentorship.

92.     Equestrians report:

- "I have nothing but fond memories of my time training with Frank Madden."

- "Mr. Madden was and is a gentleman and overall upstanding person. He is true to his word and conducts himself with the utmost professionalism, care and dedication to his students."

- "As a result of Mr. Madden's training, my daughter became a very successful equestrian and blossomed into a confident adult. My daughter's training with Mr. Madden had a tremendously positive impact on my daughter's personal and professional trajectory and success."

93.     From 1970, when Madden began his training career, through December 23, 2025—that is, for 55 years—Madden received no report claiming that he had engaged in inappropriate conduct toward an equestrian student or anyone associated with equestrian sport.

94.     On May 7, 2020, SafeSport purportedly received a report "regarding" Madden.

95.     SafeSport did not notify Madden of the report, the complainant or complainants, or the conduct alleged in the May 7, 2020 report. Instead, SafeSport administratively closed the matter under the SafeSport Code's 2020 version.

96.     On December 23, 2025, before receiving any opportunity to be heard, SafeSport publicly added Madden to its Centralized Disciplinary Database, where his name remains.

97.     That day, Madden received a Notice of Allegations and Imposition of Temporary Measures ("First NOA"). According to this document, it had been reported to SafeSport that Madden had allegedly committed an act of sexual misconduct involving Complainant 1 in Florida in March 1987—as well as a "prior" act of misconduct involving Complainant 1 in Switzerland in 1986 and a "subsequent" act of misconduct involving a witness ("Witness A") in New York in November 1987.

20

98. The First NOA contended that the alleged misconduct in Florida violates Florida criminal statutes, even though the applicable statutes of limitations have long expired.

99. On January 13, 2026, Madden received a second Notice of Allegations and Imposition of Temporary Measures ("Second NOA"), backdated to January 8, 2026. The Second NOA was nearly identical to the First NOA but removed any reference to Witness A.

100. On January 27, 2026, Madden received a third Notice of Allegations and Imposition of Temporary Measures ("Third NOA"), backdated to January 26, 2026, which repeated the report involving Complainant 1 and added a report that Madden had allegedly committed sexual misconduct involving Complainant 2 in 1984 in Virginia.

101. The Third NOA contended that the alleged misconduct in Virginia violates Virginia criminal statutes, even though the applicable statutes of limitations have long expired.

102. Madden did not engage in any misconduct, let alone the misconduct that SafeSport claims in the First, Second, and Third NOAs.

103. Before receiving the NOAs, Madden had never been aware of any complaints of misconduct against him involving Complainant 1, Witness A, or Complainant 2.

104. In the NOAs, SafeSport imposed the Temporary Measure of prohibiting Madden from "participating, in any capacity, in any event, program, activity, or competition authorized by, organized by, or under the auspices of the [USOPC], the [NGBs] recognized by the USOPC, a [LAO] as defined by the Code, or at a facility under the jurisdiction of the same." As noted, SafeSport also placed Madden's name in its Centralized Disciplinary Database.

105. The NOAs did not contain any supporting documentation, such as copies of the underlying reports to SafeSport. Instead, the NOAs provided a scant, one-sentence description of

21

each alleged incident. The NOAs failed to provide Madden with enough information about the allegations to competently defend himself.

106. On February 3, 2026, SafeSport's arbitrator held a Temporary-Measures Hearing.

107. Before and during the Temporary-Measures Hearing, SafeSport presented no evidence supporting the allegations involving Complainant 1 and Complainant 2 or suggesting that Madden presented an "ongoing or potential risk to the physical, emotional, or psychological well-being or safety of others."

108. On February 4, 2026, the arbitrator approved the Temporary Measures against Madden—despite the absence of evidence supporting the allegations involving Complainant 1 and Complainant 2, and while "[a]pplying the Code's requirement that allegations are presumed true for purposes of Temporary Measures."

109. The Temporary-Measures Hearing was not designed to resolve whether Madden had committed the alleged conduct involving Complainant 1 and Complainant 2. Consequently, the Temporary-Measures Hearing failed to afford Madden a meaningful opportunity to defend himself against the allegations and clear his name.

110. Madden may not seek review of the arbitrator's decision within the SafeSport framework for 120 days after February 4, 2026. 2024–26 Code § XII.B.6.h, i.

111. To date, Madden has not received fair notice of the allegations against him, preventing him from preparing a full and fair defense to the allegations.

112. To date, Madden has not received a meaningful opportunity to be heard on whether he committed the alleged conduct.

113. And yet, any person may visit https://cdd.uscenterforsafesport.org/, type in Madden's name, and see the following image:



114.    SafeSport's disciplinary measures against Madden have severely impaired: his ability to operate his business, Capital Hill Show Stables; his business's goodwill; his client relationships; his standing in the equestrian community; and his ability to retain and acquire clients. Accordingly, SafeSport's disciplinary measures are threatening to destroy his business. These injuries are ongoing and, absent judicial relief, will be irreparable.

115.    Due to SafeSport's disciplinary measures against him, Madden is barred from earning a living through the trade that he has practiced for 55 years: training students for high-level equestrian competition.

116.    Madden cannot train students for high-level equestrian competition outside USEF's auspices, as USEF has a monopoly on such competition.

117.    Due to SafeSport's disciplinary measures against him, Madden may not participate in any USEF event in any capacity, including the Winter Equestrian Festival ("WEF")—an annual, thirteen-week equestrian event in Wellington, Florida. WEF is the longest-running and largest horse show in the United States. It is a facility of public accommodation, welcoming not only members of the equestrian community, but the public. Madden has participated in the event since 1980.

118.    As of this action's filing, Madden has been barred from participating in the 72 equestrian events at the WEF in Wellington.

23

119.   Due to SafeSport's disciplinary measures against him, Madden may not remain on horse show grounds to accompany his wife, as she participates in her trade as a trainer, or his daughter, as she participates in her trade as an equestrian.

120.   Due to SafeSport's disciplinary measures against him, Madden's students are finding other trainers. Once those students leave his program, they will not return, even if he is ultimately vindicated—resulting in permanent damage to his business.

121.   Due to SafeSport's disciplinary measures against him, Madden is suffering from the enormous stigma of inclusion in its Centralized Disciplinary Database, along with associated tangible losses: he is barred from lawfully participating in any USEF activity, including through his business; his ability to operate his business, maintain its goodwill, and retain and acquire clients has been severely impaired; his standing and associations in the equestrian community have been severely damaged; his business is at risk of being destroyed; and a range of equestrian employment opportunities and benefits as an elite trainer participating in USEF events have been closed to him. These injuries are ongoing and, absent judicial relief, will be irreparable.

**COUNT I: VIOLATION OF THE PRIVATE NON-DELEGATION DOCTRINE**
**(FACIAL AND AS-APPLIED CHALLENGE)**

122.   Madden realleges paragraphs 1 through 121 as if fully set forth here.

123.   The at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions under the Act's at-issue provisions and the Code are facially unconstitutional under the private non-delegation doctrine.

124.   The federal government's delegation of governmental power to a private actor is constitutional only if the private actor "function[s] subordinately" to the government and is subject to the government's "authority and surveillance." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).

24

Although a private actor may give the government "recommendations" in an "advisory role," the government must "retain[] decision-making power." *Id.* at 692–93.

125. The private non-delegation doctrine flows from the separation of powers and the Vesting Clauses, which vest legislative power in Congress, *see* U.S. Const. art. I, § 1, executive power in the President, *see id.* art. II, § 1, and judicial power in the courts, *see id.* art. III, § 1. *See also Mistretta v. United States*, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.").

126. SafeSport is a private non-profit corporation. Its directors, officers, employees, agents, and other associated personnel are not "presumptively disinterested" government officials. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

127. Yet Congress empowered SafeSport to perform governmental functions, including the powers to "exercise jurisdiction" over the USOPC and NGBs "with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports"; "develop … policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies"; and "establish mechanisms that allow for the reporting, investigation, and resolution … of alleged sexual abuse in violation of the Center's policies and procedures." 36 U.S.C. § 220541(a)(1). Congress also empowered SafeSport to "take action" against any individual under its "jurisdiction," including by conducting an "investigation," imposing "sanctions," and taking "disciplinary action." *Id.*

128. Under the SafeSport Code—which the Amateur Sports Act incorporates, *see* 36 U.S.C. § 220541(b), and which comprises the "policies" and "procedures" that the Act tasked SafeSport with drafting, *see id.* § 220541(a)(1)—SafeSport claims "jurisdiction" to investigate

and resolve claims of misconduct involving any "Participant" in Olympic and amateur sports across the United States, while defining "Participant" to encompass all affiliated individuals, *see* 2024–26 Code §§ IV.A, VIII.L, M.

129.   The Amateur Sports Act imbues SafeSport, a private actor, with legislative, executive, and judicial powers. More specifically:

(a)    The Act gives SafeSport the legislative power to promulgate binding rules of private conduct associated with abuse allegations. 36 U.S.C. § 220541(a)(1)(C), (D).

(b)    The Act gives SafeSport the executive power to launch investigations, search for evidence, and otherwise enforce, or decide not to enforce, its rules against accused abusers. 36 U.S.C. § 220541(a)(1)(G), (H).

(c)    The Act gives SafeSport the judicial power to adjudicate abuse claims and thus private rights. 36 U.S.C. § 220541(a)(1)(C), (D), (H).

130.   The Amateur Sports Act's and SafeSport Code's express references to "procedural due process," a term of art that applies to federal and state governmental entities, reinforce that Congress delegated governmental power to SafeSport. *See* 36 U.S.C. § 220541(a)(1)(H); 2024–26 Code § XI.J.

131.   That Congress delegated governmental power to SafeSport finds further support in the Amateur Sports Act's provision that the "policies and procedures" that SafeSport develops "shall apply as though they were incorporated in and made a part of section 220524 of this title." 36 U.S.C. § 220541(b).

132.   The Amateur Sports Act, despite imbuing SafeSport with legislative, executive, and judicial powers over abuse claims in Olympic and amateur sports, does not authorize the federal government to control SafeSport's policies, procedures, or operations.

26

133.    Under the Amateur Sports Act, SafeSport is not functionally subordinate to any federal governmental entity, and no federal government entity retains decision-making power.

134.    Congress has no power to approve, disapprove, or modify the SafeSport Code; no executive-branch body has the power to enforce, or decide whether to enforce, alleged violations of the Code; and no court adjudicates SafeSport's claims against Participants.

135.    In all its applications, the Amateur Sports Act fails to satisfy the necessary condition for a valid private delegation: a provision for federal governmental control.

136.    The at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions under the Act's at-issue provisions and the Code are also unconstitutional under the private non-delegation doctrine as applied to Madden.

137.    SafeSport, in drafting the SafeSport Code pursuant to the Amateur Sports Act and subjecting Madden to the Code's binding rules of conduct, exercised legislative power.

138.    SafeSport, in deciding to enforce the Amateur Sports Act and the SafeSport Code against Madden, exercised executive power.

139.    SafeSport, in adjudicating Madden's private rights according to procedures set forth in the Amateur Sports Act and the SafeSport Code, exercised judicial power.

140.    SafeSport, in exercising legislative, executive, and judicial power against Madden, did not function subordinately to the federal government.

141.    Under the Amateur Sports Act, the federal government has not controlled, and may not control, SafeSport's actions against Madden.

142.    As a direct and proximate result of SafeSport's violations of the private non-delegation doctrine, Madden has suffered, and will continue to suffer, substantial and irreparable

harm, including to his reputation, business, and livelihood. Damages alone are inadequate to remedy his injuries.

143. SafeSport, in subjecting Madden to "unconstitutionally structured" proceedings that violate the private non-delegation doctrine, is inflicting substantial "here-and-now" injuries on him that "cannot be undone." *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191–92 (2023).

144. Enjoining SafeSport from continuing to violate the private non-delegation doctrine will serve the public interest without unduly prejudicing SafeSport. The public has no interest in allowing SafeSport to continue unconstitutional conduct.

145. Without declaratory and injunctive relief, SafeSport will continue to violate the private non-delegation doctrine and thereby harm Madden and other Participants.

**COUNT II: VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE
(FACIAL AND AS-APPLIED CHALLENGE)**

146. Madden realleges paragraphs 1 through 121 as if fully set forth here.

147. Madden's due-process claim includes, but is not limited to, a stigma-plus claim.

148. The at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions under the Act's at-issue provisions and the Code are facially unconstitutional under the Fifth Amendment's Due Process Clause.

149. The Supreme Court has repeatedly "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974) (collecting authorities).

150. SafeSport performs delegated public functions, traditionally exclusively reserved to the State, including: promulgating binding rules of private conduct associated with abuse allegations; investigating and prosecuting, or deciding not to investigate and prosecute, abuse claims; and punishing accused abusers through stigmatizing, public registries.

151.    Because state action is present, SafeSport is subject to the Fifth Amendment's Due Process Clause, under which "[n]o person shall be … deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V.

152.    While the Amateur Sports Act provides that SafeSport is not a "state actor," 36 U.S.C. § 220541(a)(2)(D), that statutory label does not foreclose finding that SafeSport's operations constitute state action for due-process purposes, *see Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51 (2015) ("Congressional pronouncements … are not dispositive").

153.    While the Amateur Sports Act provides that SafeSport may "impos[e] interim measures or sanctions on an individual before an opportunity for a hearing," 36 U.S.C. § 220541(a)(2)(A), Congress may not relieve SafeSport of applicable due-process requirements, *see Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("an act of the legislature, repugnant to the constitution, is void").

154.    In the Eleventh Circuit, to establish a due-process violation predicated on the deprivation of a liberty interest in reputation—that is, a stigma-plus claim—the plaintiff must show: "(1) a stigmatizing allegation"; "(2) dissemination or publication of that allegation"; and "(3) loss of some tangible interest due to publication of the stigmatizing allegation." *Bank of Jackson Cnty. v. Cherry*, 980 F.2d 1362, 1367 (11th Cir. 1993).

155.    Under the SafeSport Code, any Participant "whose eligibility has in some way been restricted by the Center" is placed in SafeSport's Centralized Disciplinary Database. 2024–26 Code § XIII.C (citing 36 U.S.C. § 220541(a)(1)(G), which requires SafeSport to "publish and maintain a publicly accessible internet website that contains a comprehensive list of adults who are barred by the Center").

156. Inclusion in SafeSport's Centralized Disciplinary Database is profoundly stigmatizing, and the Database is accessible to anyone at https://cdd.uscenterforsafesport.org/.

157. In every case, inclusion in SafeSport's Centralized Disciplinary Database results in the loss of tangible interests, including a restriction on the Participant's eligibility to lawfully participate in the Olympic or amateur sport at issue.

158. SafeSport's Temporary Measures deprive Participants of property and liberty interests that are protected under the Due Process Clause, including the liberty interest in avoiding inclusion in SafeSport's Centralized Disciplinary Database.

159. SafeSport, in imposing Temporary Measures on Participants before affording them an opportunity to be heard, violates the Due Process Clause. *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) ("[T]he Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property.").

160. Participants' private interests, including their interest in avoiding the stigma of inclusion in SafeSport's Centralized Disciplinary Database, are substantial; SafeSport faces no administrative, practical, or financial obstacles in giving Participants a pre-deprivation hearing; and the risk of imposing unwarranted Temporary Measures on Participants is impermissibly high. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (balancing interests).

161. SafeSport's post-deprivation Temporary-Measures Hearing violates the Due Process Clause because it does not afford Participants a meaningful opportunity to contest the allegations against them and clear their names.

162. SafeSport's Sanctions deprive Participants of property and liberty interests that are protected under the Due Process Clause—just as with Temporary Measures.

163. SafeSport, in imposing Sanctions on Participants before affording them an opportunity to be heard, violates the Due Process Clause—just as with Temporary Measures.

164. SafeSport's post-deprivation Merits Arbitration violates the Due Process Clause because it does not afford Participants a meaningful opportunity to contest the allegations against them and clear their names.

165. In all their applications, SafeSport's Temporary Measures and Sanctions imposed under the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, and the SafeSport Code violate the Due Process Clause.

166. The at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions under the Act's at-issue provisions and the Code are also unconstitutional under the Due Process Clause as applied to Madden.

167. The Temporary Measures that SafeSport imposed on Madden—placing him in its Centralized Disciplinary Database and prohibiting him from participating in any USEF activity in any capacity—have deprived him of his protected interests, including his liberty interests in avoiding the stigma of inclusion in the Database and pursuing his chosen vocation, and his property interests associated with his business, Capital Hill Show Stables, including its goodwill.

168. Madden's inclusion in SafeSport's Centralized Disciplinary Database has resulted in associated tangible losses: he is barred from lawfully participating in any USEF activity, including through his business; his ability to operate his business, maintain its goodwill, and retain and acquire clients has been severely impaired; his standing and associations in the equestrian community have been severely damaged; his business is at risk of being destroyed; and a range of equestrian employment opportunities and benefits as an elite trainer participating in USEF events have been closed to him.

31

169.    SafeSport's failure to afford Madden a pre-deprivation hearing violated the Due Process Clause. His private interests, including his interest in avoiding the stigma of inclusion in SafeSport's Centralized Disciplinary Database, were substantial; SafeSport faced no administrative, practical, or financial obstacles in giving him a pre-deprivation hearing; and the risk of imposing unwarranted Temporary Measures on him was impermissibly high. *See Mathews*, 424 U.S. at 335.

170.    SafeSport's post-deprivation Temporary-Measures Hearing did not cure the due-process violation, as it failed to afford Madden a meaningful opportunity to contest the serious allegations against him and clear his name.

171.    SafeSport's Temporary Measures against Madden also violated the Due Process Clause because SafeSport punished him for alleged acts (a) that SafeSport did not specifically identify, (b) that were time-barred under the applicable statutes of limitations, and (c) that occurred decades before SafeSport enacted the SafeSport Code.

172.    SafeSport violates the Due Process Clause by failing to provide Madden and other Participants fair notice of the allegations against them and thereby preventing them from preparing a full and fair defense to the allegations.

173.    SafeSport violates the Due Process Clause because it is a single entity performing a combination of legislative, executive, and adjudicative roles, thereby preventing Madden and other Participants from receiving a fair and unbiased hearing.

174.    Madden alternatively pleads that, if state action is not present, SafeSport has committed a statutory due-process violation. In employing "procedural due process" in 36 U.S.C. § 220541(a)(1)(H), the Amateur Sports Act swept in old soil: precedent on constitutional due process. Even if SafeSport is not a state actor, meaning that the Due Process Clause does not

directly apply, SafeSport must satisfy procedural due process through 36 U.S.C. § 220541(a)(1)(H). Although the Act claims not to "create a private right of action," *id.* § 220541(a)(2)(C), that attempt to shield SafeSport from judicial scrutiny is ultra vires and void.

175. As a direct and proximate result of SafeSport's due-process violations, Madden has suffered, and will continue to suffer, substantial and irreparable harm, including to his reputation, business, and livelihood. Damages alone are inadequate to remedy his injuries.

176. SafeSport, in subjecting Madden to "unconstitutionally structured" proceedings that violate the Due Process Clause, is inflicting substantial "here-and-now" injuries on him that "cannot be undone." *See Axon*, 598 U.S. at 191–92.

177. Enjoining SafeSport from continuing to violate the Due Process Clause will serve the public interest without unduly prejudicing SafeSport. The public has no interest in allowing SafeSport to continue unconstitutional conduct.

178. Without declaratory and injunctive relief, SafeSport will continue to violate the Due Process Clause and thereby harm Madden and other Participants.

### COUNT III: VIOLATION OF ARTICLE III
### (FACIAL AND AS-APPLIED CHALLENGE)

179. Madden realleges paragraphs 1 through 121 as if fully set forth here.

180. Article III of the Constitution vests the "judicial Power" to adjudicate "Cases" in "Law and Equity" in courts. U.S. Const. art. III, § 1; *id.*, § 2, cl. 1.

181. Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856).

182. The Supreme Court has "repeatedly explained that matters concerning private rights may not be removed from Article III courts." *SEC v. Jarkesy*, 603 U.S. 109, 127 (2024).

183.     Under the Amateur Sports Act and the SafeSport Code, SafeSport brings actions against Participants, including Madden, that are in the nature of suits at common law or in equity and that concern private rights—in violation of Article III.

184.     Under the Amateur Sports Act and the SafeSport Code, SafeSport brings actions against Participants, including Madden, that are analogous to traditional actions for torts such as battery and assault—in violation of Article III.

185.     Under the Amateur Sports Act and the SafeSport Code, SafeSport performs, with regard to Participants including Madden, the exclusive judicial functions of adjudicating private rights, determining liability under law, and granting remedies—in violation of Article III.

186.     SafeSport's findings, conclusions, and remedies concerning Participants, including the Temporary Measures concerning Madden, are not subject to de novo Article III adjudication before they take effect—in violation of Article III.

187.     SafeSport's actions against Participants, including Madden, do not implicate the public-rights exception to Article III. SafeSport's actions are not analogous to and lack the historical pedigree of the public-rights matters that *Jarkesy* identified: "the collection of revenue," "immigration," "tariffs," "relations with Indian tribes," "the administration of public lands," and "the granting of public benefits." 603 U.S. at 128–32.

188.     As a direct and proximate result of SafeSport's Article III violation, Madden has suffered, and will continue to suffer, substantial and irreparable harm, including to his reputation, business, and livelihood. Damages alone are inadequate to remedy his injuries.

189.     SafeSport, in subjecting Madden to "unconstitutionally structured" proceedings that violate Article III, is inflicting substantial "here-and-now" injuries on him that "cannot be undone." *See Axon*, 598 U.S. at 191–92.

190.     Enjoining SafeSport from continuing to violate Article III will serve the public interest without unduly prejudicing SafeSport. The public has no interest in allowing SafeSport to continue unconstitutional conduct.

191.     Without declaratory and injunctive relief, SafeSport will continue to violate Article III and thereby harm Madden and other Participants.

### PRAYER FOR RELIEF

Madden respectfully requests that this Court:

1.      Declare that the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions taken under the Act and the Code are unconstitutional—facially and as applied—under the private non-delegation doctrine.

2.      Declare that the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions taken under the Act and the Code are unconstitutional—facially and as applied—under the Due Process Clause.

3.      Declare that the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, the SafeSport Code, and SafeSport's actions taken under the Act and the Code are unconstitutional—facially and as applied—under Article III.

4.      Grant preliminary injunctive relief in the form of an order that, during this action's pendency: (a) enjoins SafeSport from proceeding against Madden under the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, and the SafeSport Code; and (b) vacates the Temporary Measures imposed on Madden, including by permitting him to participate in USEF activities and removing him from the Centralized Disciplinary Database.

5.      Grant permanent injunctive relief in the form of an order that: (a) enjoins SafeSport from proceeding against Madden under the at-issue provisions of the Amateur Sports Act, *see* 36 U.S.C. §§ 220541–43, and the SafeSport Code; and (b) vacates the Temporary

Measures imposed on Madden, including by permitting him to participate in USEF activities and removing him from the Centralized Disciplinary Database.

6. Award Madden costs and expenses incurred in connection with this action, including reasonable attorneys' fees.

7. Award any further relief, in law or equity, this Court deems just and proper.

Dated: March 20, 2026

Respectfully submitted,

KASOWITZ LLP

*/s/ Maria H. Ruiz*
Maria H. Ruiz
(Florida Bar No. 182923)
1441 Brickell Avenue
Suite 1420
Miami, Florida 33131
Telephone: (786) 587-1044
Email: mruiz@kasowitz.com

Marc E. Kasowitz (*pro hac vice* forthcoming)
Amit R. Vora (*pro hac vice* forthcoming)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email: mkasowitz@kasowitz.com
        avora@kasowitz.com

*Counsel for Plaintiff*